*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| EDWARD BROWN and HEIDI BROWN, | ) ) ) | Supreme Court Nos. S-13613/13643 |
| Appellants and Cross Appellees, | ) ) ) | Superior Court No. 3AN-05-04449 CI |
| | ) | O P I N I O N |
| v. | ) ) | No. 6811 - August 16, 2013 |
| LEON KNOWLES and E. BROWN INC. d/b/a INTERNATIONAL STEEL, | ) ) ) ) | |
| Appellees and Cross Appellants. | ) ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: William H. Ingaldson, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellants/Cross Appellees. Kim Dunn, Landye Bennett Blumstein LLP, Anchorage, for Appellee/Cross Appellant Leon Knowles.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices.

CARPENETI, Chief Justice.
FABE, Justice, dissenting.

## I. INTRODUCTION

The unpaid employee of a closely-held corporation sued the corporation and its president for back wages in superior court. The day after the employee filed suit,

the corporation filed for Chapter 11 bankruptcy. The bankruptcy court discharged the corporation's debts, and the superior court dismissed the corporation, but the superior court allowed trial to proceed against the president on a veil-piercing theory. A jury found that the corporation was a mere instrumentality of the president, and that the president owed the former employee wages under a bonus agreement. The president appeals the superior court's decision on multiple grounds.

When a corporation files for bankruptcy, the corporation's legal claims become property of the bankruptcy estate. Here, the president claims that the corporation theoretically could have brought the plaintiff's veil-piercing claim against him prior to bankruptcy. Thus, the president reasons, the employee's veil-piercing claim became property of the bankruptcy estate. But in this case, the plaintiff did not allege injury to the corporation, and therefore the corporation could not have brought the plaintiff's legal claim against its president. For this reason, the plaintiff's veil-piercing claim did not become property of the estate. And the discharge of the corporation's personal liability on the debt did not prevent the superior court from establishing the corporation's indebtedness for the sole purpose of holding the president liable. Thus, the court could pierce the corporate veil to hold the president liable.

Additionally, the mere-instrumentality test is a sufficient basis to pierce the corporate veil. The superior court did not err in piercing the veil based on the jury's finding that the mere-instrumentality test was met. The superior court correctly answered the jury's questions on the mere-instrumentality test and properly determined the statute of limitations on the employee's claims under the Alaska Wage and Hour Act (AWHA). The superior court's calculation of the overtime and derivative AWHA claims was also proper, and the superior court did not err in awarding attorney's fees. The superior court did not err in declining to find that a dismissed party who was only minimally involved in the litigation was a prevailing party. We therefore affirm.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In 1999, Edward Brown and Leon Knowles entered into a bonus agreement. At the time, Brown was the president, chief operating officer, managing officer, and either the sole owner or half-owner of a closely-held Anchorage-based construction company incorporated as E. Brown, Inc., but doing business as International Steel. Brown stated that his wife Heidi owned 50% of International Steel's stock, but Brown could not explain how or when Heidi obtained the stock, and his account of how she obtained the stock conflicted with International Steel's financial reports. In a 2004 financial statement, Brown stated that he owned 100% of the issued stock.

Brown admitted that he was not aware of the legal requirement that International Steel hold annual meetings. The only minutes found in the corporate record document a meeting between Brown and Heidi held on Grand Cayman Island, British West Indies, in 1988, shortly after Brown's marriage to Heidi. That meeting occurred in November 1988 after International Steel had been involuntarily dissolved by the State of Alaska for failure to pay its taxes. International Steel came back into good standing in 1989, but the corporate record contains no account of any annual meetings after 1988.

In 1994, Brown recruited Knowles to work for International Steel as an "expediter," but as International Steel's volume of work increased, Knowles began receiving project management work, taking on his first official project management job in 1997. In the fall of 1999, Knowles requested a raise. Knowles testified that Brown suggested using a bonus plan instead of a wage raise to compensate him. The two parties reached an agreement on a bonus plan, which Knowles drafted and the parties never signed.

On the basis of the bonus agreement, Knowles received a bonus of $27,455 in 2000, but in 2001 International Steel began to experience financial troubles and was

unable to pay a bonus.  The next year, after International Steel received a $968,000 settlement on an old project, Brown paid Knowles a bonus of $100,000 for work performed under the bonus agreement.  Knowles claimed at trial that, according to his calculations, he was owed an additional $72,666 for that work.  Knowles testified that Brown assured him that International Steel would pay him the rest when the company could afford it.  Brown testified that he did not believe he owed Knowles any more bonus, but that he could not remember telling Knowles this, because he did not know "how that would come up."

At no time did International Steel pay Knowles overtime on his bonus payments.  Knowles testified that when he and Brown negotiated the bonus agreement, Knowles was unaware of the provisions in the Alaska Wage and Hour Act that require overtime payments on non-discretionary bonuses.[1]

International Steel's finances continually deteriorated until it had completely drawn down its credit line.  Knowles, who testified he had "some serious medical issues," discovered that his health insurance had been cancelled due to nonpayment by International Steel on October 6, 2004.  He resigned the same day.  Knowles testified that Brown continued to communicate with him about an outstanding claim on one of Knowles's projects, the Bassett claim, which seemed potentially to be worth millions of dollars to International Steel.  Knowles also purchased his company truck from International Steel, receiving a bill of sale in return, signed by Brown.  The bill of sale, dated November 2004, refers to "wages and/or bonus payments which are outstanding and currently owed by International Steel to Knowles," and according to which "the parties will determine at a later time the total amount which Knowles is owed."

---

[1]     *See* AS 23.10.060.

**B. Proceedings**

On January 19, 2005, Knowles filed suit in superior court against International Steel and Brown. His original complaint included: (1) a breach of contract claim against International Steel based on the bonus agreement; (2) a breach of contract claim against the company based on failure to pay the agreed-upon bonus; (3) accompanying AWHA claims against the company based on failure to pay overtime on the bonus and pay raise; (4) assorted common law claims directed against both the company and Brown; and (5) a claim under AS 23.05.140 based on International Steel's failure to pay Knowles all of his wages within three days of termination of the employment contract.

The next day, on January 20, 2005, International Steel filed a petition for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the District of Alaska.

After Brown filed his answer to Knowles's complaint, the superior court noted that Knowles's case against International Steel had been stayed by the bankruptcy proceedings and asked the parties whether they intended the bankruptcy stay to apply to Brown as well. The parties stipulated to a six-month stay. In November 2005, they renewed the stay to apply until March 10, 2006.

Meanwhile, Knowles filed a proof of claim with the bankruptcy court dated May 18, 2005, for unpaid compensation from International Steel in the years 2002 to 2005, estimating that he was owed $365,000 in unsecured debts and $5,000 in secured debts from International Steel, but noting in an attachment that he was still gathering information regarding the amounts due. On April 14, 2006, the bankruptcy court confirmed International Steel's Amended Plan of Reorganization (the Plan). Knowles, along with other unsecured nonpriority claimants, received nothing under the Plan.

Nonetheless, he filed a notice withdrawing his claim against International Steel in the bankruptcy court.

The superior court reported in a later order that at a status hearing on September 5, 2006, "in anticipation of the approval of the reorganization plan, the parties agreed the complaint against [Brown] could proceed." Later that month, Knowles filed an amended complaint, still directed toward both International Steel and Brown, but adding for the first time a veil-piercing claim against Brown. The claim alleged that International Steel "was a mere instrumentality or alter ego of Brown." Brown's answer asserted "collateral estoppel or *res judicata*" as an affirmative defense.

In early 2007, the parties stipulated to dismiss International Steel from the state court litigation without prejudice. After Knowles moved for partial summary judgment against Brown, Brown opposed and cross-moved for partial summary judgment, asserting as a defense that Knowles's wage and overtime claims were barred by AWHA's two-year statute of limitations.

In early 2008, Knowles was granted leave to file a second amended complaint, seeking to add a spoliation claim and to add Heidi as a defendant. His motion was supported by affidavits from himself and his attorney. These affidavits asserted that Brown had destroyed files and had been unable to produce International Steel's corporate book, "which includes corporate resolutions, minutes of annual shareholder meetings, and minutes of board meetings." Knowles's affidavit also indicated that he had recently discovered Heidi was a shareholder of International Steel, contrary to Brown's representations throughout Knowles's relationship with him that Brown was International Steel's sole shareholder.

In March 2008, the superior court issued an order that made several preliminary legal determinations regarding AWHA's overtime provisions, but it also found genuine issues of material fact surrounding the bonus agreement and its effects.

The next month, International Steel moved for dismissal or summary judgment of Knowles's spoliation claim, arguing that the claim violated the company's discharge in bankruptcy, and noting in any case that the corporate book had now been found and produced to Knowles. International Steel, Brown, and Heidi also filed counterclaims alleging that Knowles breached the covenant of good faith and fair dealing in various ways and that Knowles's claims against International Steel violated the bankruptcy discharge.

In May 2008, the U.S. Bankruptcy Trustee moved to dismiss or convert International Steel's bankruptcy case for cause, based on International Steel's "failure to file post-confirmation reports and to pay quarterly fees." The IRS joined the motion, based on late payments by International Steel. The company opposed the Trustee's motion on May 28, arguing that it had "performed its obligations to provide post-petition reports and is current on its quarterly fees."

In July 2008, Knowles moved to file a third amended complaint, to add parallel claims under the federal Fair Labor Standards Act (FLSA) to his wage claims under AWHA, and to drop unnecessary claims. The motion was granted.

In an October 2008 order granting in part and denying in part Brown's cross-motion for partial summary judgment, the superior court concluded that the accrual of both Knowles's AWHA and contract claims "cannot be decided as a matter of law, but is for the jury as a matter of fact."

The case went to trial. On the first day, November 3, 2008, Knowles moved to dismiss Heidi and International Steel. Brown asserted, without prior briefing, that because of International Steel's bankruptcy discharge, the superior court could not proceed against Brown on a veil-piercing theory. The superior court ordered a stay of claims against International Steel, allowed the veil-piercing claim to proceed against

Brown, and ordered the dismissal with prejudice of the claims involving Heidi, while reserving the matter of attorney's fees for later resolution.

Before the jury began deliberations, the parties agreed that the court would address the matter of overtime after the verdict was returned. On November 19, the jury delivered a verdict. It found "it to be more likely true than not true that [International Steel] owes [Knowles] additional bonus compensation" in the amount of $62,311. It found that Knowles was entitled to keep the $100,000 bonus compensation as of September 25, 2002. The jury did not find "it more likely true than not true that [International Steel] owes [Knowles] additional hourly pay." Finally, the jury did not find that "the corporate form of [International Steel] was used to defeat public convenience, justify wrong, commit fraud, or defend crime," but it did find that International Steel "was a mere instrumentality or alter ego of Ed Brown."

On February 3, 2009, the bankruptcy court issued an order granting the U.S. Trustee's motion to dismiss International Steel's bankruptcy case, a motion which International Steel non-opposed on the day of the bankruptcy court's decision. The bankruptcy court stated, at the company's request, that "International Steel shall continue to have the right and ability to operate its business, including any outstanding construction projects, as if it had not filed for bankruptcy."

After the jury delivered its verdict, the superior court issued an order denying Heidi's motion for attorney's fees, on the ground that there was no prevailing party as between Heidi and Knowles. The court also concluded that Knowles's AWHA claim to overtime on the unpaid bonus was not barred by AWHA's statute of limitations.

On September 28, 2009, the superior court issued an order granting in part Knowles's motion for attorney's fees under AWHA. The court declared that Knowles was the prevailing party. The court then granted Knowles 60% of his actual fees, taking into account: (1) the amount of work Knowles's attorneys dedicated to non-AWHA-

related claims; (2) the Rule 82 fees Knowles would receive; and (3) the overlap in Knowles's attorneys' work when Knowles changed counsel. On the same day, the superior court issued its final judgment, awarding Knowles $216,894.83 based on Knowles's unpaid bonus; his unpaid overtime on that bonus; the liquidated damages, attorney's fees, and costs Knowles received under AWHA for non-payment of overtime; and interest.

Brown and Heidi appeal.

## III. STANDARD OF REVIEW

We review questions of law de novo.[2] We also review "questions regarding personal and subject matter jurisdiction de novo because jurisdictional issues are questions of law subject to this court's independent judgment."[3] Where a party has objected to a jury instruction in accordance with Rule 51(a),"[t]he correctness of jury instructions is reviewed de novo."[4]

We review findings of fact for clear error,[5] and we find clear error only " 'when we are left with a definite and firm conviction based on the entire record that a

---

[2]     *Jacob v. State, Dep't of Health & Soc. Servs.*, 177 P.3d 1181, 1184 (Alaska 2008) ("We apply our independent judgment to questions of law, adopting 'the rule of law most persuasive in light of precedent, reason, and policy.' " (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979))).

[3]     *In re Estate of Fields*, 219 P.3d 995, 1003 (Alaska 2009) (internal quotation marks omitted).

[4]     *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1197 n.30 (Alaska 2009).

[5]     *In re Protective Proceedings of W.A.*, 193 P.3d 743, 748 (Alaska 2008).

mistake has been made.' "[6] With regard to mixed questions of law and fact, we "review[] the superior court's factual findings for clear error, and the legal issues de novo."[7]

Finally, we review awards of attorney's fees for abuse of discretion,[8] and we will identify an abuse of discretion only "if an award is arbitrary, capricious, manifestly unreasonable, or improperly motivated."[9]  Insofar as the trial court's calculation of attorney's fees consists purely of the interpretation of law, however, we review the interpretation de novo.[10]

## IV. DISCUSSION

### A. Knowles's Veil-Piercing Claim Was Not The Property Of The Corporation's Bankruptcy Estate Because The Claim Alleged No Injury To The Corporation.

Once a bankruptcy case has been initiated by the filing of a bankruptcy petition,[11] section 362(a)(3) of the Bankruptcy Code[12] operates as an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or

---

[6]      *Id*. (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004)).

[7]      *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009).

[8]      *Okagawa v. Yaple*, 234 P.3d 1278, 1280 (Alaska 2010).

[9]      *Id*. (quoting *Cook Schuhmann & Groseclose, Inc. v. Brown & Root, Inc.*, 116 P.3d 592, 597 (Alaska 2005)) (internal quotation marks omitted).

[10]      *Id*.

[11]      "The filing of a . . . bankruptcy petition commences a case in the bankruptcy court." *In re Transcolor Corp.*, 296 B.R. 343, 354 (Bankr. D. Md. 2003) (referring to 11 U.S.C. §§ 301, 303).

[12]      11 U.S.C. §§ 101-1330 ("the Bankruptcy Code").

to exercise control over property of the estate."[13] "Property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[14] "Property of the estate" is construed broadly and includes any cause of action that belongs to the debtor.[15] A cause of action belongs to the debtor if the debtor could have brought it as of the commencement of the case.[16] Only the trustee has standing to bring the estate's legal claims,[17] and the bankruptcy court is the proper forum to resolve disputes about property of the estate.[18]

A corporation can bring a veil-piercing claim against its own corporate insider only if the veil-piercing claim alleges that the corporate insider's conduct caused an actionable injury to the corporation.[19] If a corporation could have brought a veil-

---

[13] 11 U.S.C. § 362(a)(3); *see also* Seymour Roberts, Jr., *Alter-Ego Claims in Bankruptcy*, 2005 NORTON ANN. SURV. BANKR. L. Part I § 18 at Part V ("The Stay") (2006); *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1150 (5th Cir. 1987).

[14] 11 U.S.C. § 541(a)(1).

[15] *See, e.g.*, *Transcolor*, 296 B.R. at 359 (noting that § 541(a) "casts a wide net"); *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987) (noting that § 541 "offers an expansive definition of property comprising the estate").

[16] *See S.I. Acquisition*, 817 F.2d at 1150 ("a section 362(a)(3) stay applies to a cause of action that under state (or federal) law belongs to the debtor"); *In re JNS Aviation, LLC*, 350 B.R. 283, 291 (Bankr. N.D. Tex. 2006) (concluding "that a cause of action belongs to the bankruptcy estate if, under applicable state law, the debtor could have raised the claim as of the commencement of the case").

[17] *In re E.F. Hutton Sw. Props. II, Ltd.*, 103 B.R. 808, 812 (Bankr. N.D. Tex. 1989).

[18] *Transcolor*, 296 B.R. at 359.

[19] *In re E.F. Hutton*, 103 B.R. at 812 ("The injury characterization analysis should be considered as an inseparable component of whether an action belongs to the
(continued...)

piercing claim against its own corporate insider prior to bankruptcy, then the veil-piercing claim becomes property of the estate.[20]

### 1. If a veil-piercing claim alleges no injury to the corporation, then the claim belongs to the creditor.

Did the corporation in this case have a legal claim against Brown as of the commencement of its bankruptcy case? *In re Educators Group Health Trust*[21] explained the proper framework for determining whether a claim belongs to a creditor of the corporation or to the corporation's bankruptcy estate, holding that claims alleging "direct

---

[19]    (...continued)
corporation or individual [creditor]."); *In re Teknek, LLC*, 563 F.3d 639, 647 (7th Cir. 2009) ("To determine whether an action accrues individually to a claimant or generally to a corporation, then, we must look to the injury for which relief is sought."). If the claim alleges no actionable injury to the corporation, then the corporation has no legal claim against its insider. *Stodd v. Goldberger*, 73 Cal. App. 3d 827, 833 (Cal. App. 1977) ("[T]rustee in bankruptcy of a bankrupt corporation, could not maintain an action against defendants to disregard the corporate entity absent some allegation of injury to the corporation giving rise to a right of action in it against defendants.").

Of course, for such a claim to be viable, applicable state law must allow a corporation to pierce its own veil. States are split on this issue. *Compare In re S.I. Acquisition*, 817 F.2d at 1152-53 (determining that Texas law would allow a corporation to pierce its own veil), *with In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225-26 (8th Cir. 1987) (determining that Arkansas law would not allow a corporation to pierce its own veil). *See In re Icarus Holding, LLC*, 391 F.3d 1315, 1321 (11th Cir. 2004) *certified question answered sub nom. Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296 (Ga. 2005) ("Like many courts that have addressed this issue, we hold that in order to bring an exclusive alter ego action under section 541, a bankruptcy trustee's claim should (1) be a general claim that is common to all creditors and (2) be allowed by state law.").

But it is not necessary to reach this issue here, because the veil-piercing claim was not property of the bankruptcy estate, as shown below.

[20]    *In re E.F. Hutton*, 103 B.R. at 811-12.

[21]    25 F.3d 1281 (5th Cir. 1994).

injury" to creditors belonged to creditors, but claims alleging injury to the corporation and only derivative injury to creditors belonged to the bankruptcy estate.[22]  And this is the correct analysis under Alaska law:  In Alaska if a plaintiff fails to assert a legal injury entitling the plaintiff to relief, the plaintiff has no legal claim and the suit must be dismissed.[23]

If a claim alleges *indirect harm* to a creditor (i.e. harm that derives from an injury to the corporation), then the claim belongs to the corporation's estate.[24]  A claim that a director defrauded the corporation would be such a claim.[25]  Conversely, if a claim does not "explicitly or implicitly allege harm" to the corporation — such as the present

---

[22]      *Id.* at 1284.  The dissent analyzes whether "the estate in this case did have standing to bring *an* alter ego claim against Brown." (Emphasis added.)  But that is the wrong question.  The correct question is whether the estate had standing to bring *this* claim.  Because this claim (one for wages) alleged no injury to the corporation, the estate lacked standing.

[23]      *See* Alaska R. Civ. Pro. 12(b)(6) (providing that a complaint may be dismissed for failure to state a claim upon which relief can be granted); *Keller v. French*, 205 P.3d 299, 305 (Alaska 2009) ("Because the Keller plaintiffs allege *no plausible injury* to their own interests, they lack interest-injury standing.") (emphasis added); *Brause v. State, Dep't of Health & Soc. Servs.*, 21 P.3d 357, 359 (Alaska 2001) ("The ripeness doctrine requires a plaintiff to claim that either *a legal injury* has been suffered or that one will be suffered in the future.") (emphasis added).  *See also Neese v. Lithia Chrysler Jeep of Anchorage, Inc.*, 210 P.3d 1213,1219 (Alaska 2009) (affirming summary judgment in favor of certain defendants because the plaintiffs "failed to allege *any actual injury* caused by" those defendants) (emphasis added).

[24]      *In re Educators Group Health Trust*, 25 F.3d at 1284.

[25]      *See Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (quoting *Stodd v. Goldberger*, 73 Cal. App. 3d 827, 833 (Cal. App. 1977)) (collecting examples of conduct that injures the corporate debtor).

claim that wages were unpaid to the claimant — then the corporation has no legal claim, and the claim does not become part of the corporation's estate.[26]

In *Smith v. Arthur Andersen LLP*, the Ninth Circuit explained that this distinction may at times be difficult:

> Although the line between "claims of the debtor," which a trustee has statutory authority to assert, and "claims of creditors," which *Caplin* [*v. Marine Midland Grace Trust Co. of New York*] bars the trustee from pursuing, is not always clear, the focus of the inquiry is on whether the Trustee is seeking to redress injuries to the debtor itself caused by the defendants' alleged conduct.[27]

*In re Transcolor* illuminates the distinction between claims that belong to the estate and claims that belong to creditors:

> Confusion results when courts mistakenly apply the term "piercing the corporate veil" to distinctly different causes of action against the individuals who stand behind the corporation. The true action to "pierce the corporate veil" is

---

[26] *See In re Educators Group Health Trust*, 25 F.3d at 1284 ("[I]f the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."); *see also Metro. Creditors' Trust v. Pricewaterhousecoopers, LLP*, 463 F. Supp. 2d 1193, 1200 (E.D. Wash. 2006) ("In determining whether the trustee has standing to bring a particular claim, courts should focus on 'whether the Trustee is seeking to redress injuries to the debtor itself caused by the defendants' alleged conduct.'") (quoting *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005)); *In re E.F. Hutton*, 103 B.R. at 812 (explaining that the trustee lacks standing to bring a creditor's personal claims because such claims are not "property of the estate").

[27] 421 F.3d at 1002. In *Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 434 (1972), the United States Supreme Court held that a Chapter 10 trustee did not have standing to sue on behalf of individual creditors. Chapter 10 was the reorganization chapter before Congress enacted the Bankruptcy Code in 1978. *See In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1227 (8th Cir. 1987).

brought by parties injured *by the corporation* to hold liable those corporate officers, directors and/or stockholders whose [conduct] caused the injury to the plaintiffs. Liability for harm caused by the corporation is imposed upon the corporation's alter egos by disregarding the corporate form.

A completely different cause of action is one brought directly by the corporation (or derivatively by shareholders) against corporate alter egos for damage *to the corporation* itself through mismanagement or fraud.[28]

The critical distinction is between (1) claims that allege injury to the corporation (and thus, *indirect* injury to all creditors generally) and (2) claims that allege *direct* injury to creditors personally. If a corporation files for bankruptcy, the former constitute property of the estate, but the latter do not.

"The Ninth Circuit [has] held that misuse of a company's assets qualifies as an injury to the [corporation] . . . ."[29] And the Ninth Circuit has collected examples of claims where the corporation was injured, including an action to set aside fraudulent transfers made from the corporation to the alter-ego, an action against an alter-ego for conversion of the corporation's assets, and an action "on an alter ego theory upon allegations that . . . defendants deposited corporation funds into their personal bank accounts or that corporation funds were received by the defendants personally."[30]

Stated simply, if no injury to the corporation is alleged in the creditor's alter-ego claim, then the alter-ego claim belongs to the creditor personally, and it does

---

[28]     *In re Transcolor*, 296 B.R. 343, 362 (Bankr. D. Md. 2003) (emphasis added).

[29]     *Metro. Creditors' Trust*, 463 F. Supp. 2d at 1200 (quoting *Smith*, 421 F.3d at 1003) (internal quotation marks omitted).

[30]     *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (internal quotation marks and citation omitted).

not become part of the bankruptcy estate.[31]  When a claim belongs to the creditor personally, the creditor may bring it outside of the bankruptcy case.[32]  Because Knowles's claim involved no injury to the corporation and belonged to Knowles personally, the superior court properly allowed him to bring the claim outside of the bankruptcy case.

### 2. Knowles's claim alleged no injury to International Steel.

To identify the nature of the injury asserted we look to the "facial allegations in [the] complaint."[33]  Knowles's Third Amended Complaint alleged that Brown's conduct directly injured Knowles in several ways, including failure to pay wages, bonuses, and overtime.  The complaint does not allege that Brown misused corporate assets, converted corporate funds to his own use, or otherwise injured the corporation.[34] Because Knowles alleged no injury to the corporation, International Steel

---

[31]    *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 583 (5th Cir. 2008) ("Whether a specific cause of action belongs to a bankruptcy estate is likewise a matter of law that we decide by reference to the facial allegations in the complaint."); *see also In re Glo-Tex Intel, Inc.*, No. 07-06449-JW, 2010 WL 4916574, *6 (Bankr. D.S.C. Nov. 30, 2010) (holding that because the plaintiffs alleged that their injury derived from harm to the debtor, the claims became "property of the estate").

[32]    *See Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) (explaining that the trustee may only enforce the entitlements of a corporation, not the entitlements of a creditor).

[33]    *In re Seven Seas Petroleum, Inc.*, 522 F.3d at 583 (citing *In re Educators Group Health Trust*, 25 F.3d 1281, 1285 (5th Cir. 1994)).

[34]    None of Knowles's earlier complaints alleged that Brown's conduct injured the corporation.

could not have asserted Knowles's claim prior to its bankruptcy filing. Thus, Knowles's veil-piercing claim did not become property of the estate.[35]

B. **In The Ninth Circuit A Trustee May Not Sue On Behalf Of Creditors Whose Claims Are Not Property Of The Estate.**

The court today considers two legal questions: (1) which legal claims are property of the estate (a matter of state law) and (2) whether the trustee has power to bring a claim on behalf of a creditor of the estate absent a legal claim held by the estate (a matter of federal law that has been decided by the Ninth Circuit in the negative). The Ninth Circuit has rejected the notion that a trustee may sue on behalf of creditors whose claims are not property of the estate: "In the Ninth Circuit, 'it is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the [debtor] itself.' "[36] Thus, under

---

[35] Our conclusion is bolstered by Brown's own arguments throughout the litigation. In his memorandum in support of his motion for entry of judgment, Brown stated, "There was simply no evidence that Edward Brown used corporate assets for his own personal benefit." Brown also asserted, "[T]here was simply no evidence that Edward Brown made decisions that were in his personal interests and against the best interests of the corporation."

The dissent suggests that "an alter-ego's control of a corporation constitutes a legal injury entitling the corporation to relief." But "[a] claim based on the alter ego theory is not in itself a claim for substantive relief, but rather is procedural. A finding of fact of alter ego, standing alone, creates no cause of action. . . . An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action such as a tort or breach of contract." 1 FLETCHER, CYCLOPEDIA OF PRIVATE CORPORATIONS § 41.10 (2006) (citations omitted).

[36] *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005). This rule is consistent with the only United States Supreme Court opinion on point. *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 428-34 (1972) (holding that the bankruptcy trustee is not empowered to bring claims on behalf of creditors or to collect money not owed to the estate).

applicable Ninth Circuit precedent, the trustee in this case would have standing to bring claims *only if* those claims were "held by the [debtor] itself."[37] Under well-settled Ninth Circuit law, the trustee could not have asserted Knowles's claim because he alleged injury only to himself — not to International Steel.[38]

## C. International Steel, Not Brown, Was The Bankruptcy Debtor And Thus Only International Steel, Not Brown, Was Entitled To Bankruptcy Protection.

Brown claims that allowing Knowles's alter-ego claim to proceed outside of bankruptcy would undermine the Bankruptcy Code because: (1) Knowles would collect from an undiluted pool of assets rather than being limited "to no more than a pro-rata distribution"; and (2) a multi-jurisdictional rush to potentially conflicting judgments would ensue. But the Bankruptcy Code generally[39] protects only the debtor and its

---

[37] *Smith*, 421 F.3d at 1002.

[38] *Id.*; *In re Lucas Dallas*, 185 B.R. 801, 804–05 (B.A.P. 9th Cir. 1995) (holding that bankruptcy trustees lack standing to assert actions against parties *on behalf of creditors*); *Metro. Creditors' Trust v. Pricewaterhousecoopers, LLP*, 463 F. Supp. 2d 1193, 1200 (E.D. Wash. 2006) ("The Ninth Circuit held that misuse of a company's assets 'qualifies as an injury to the firm which is sufficient to confer standing upon the trustee.' "); *cf. In re Folks*, 211 B.R. 378, 387 (B.A.P. 9th Cir. 1997) (trustee could bring alter-ego claim because alter ego "used [debtor's] bank accounts and funds . . . for personal and family expenditures . . . ."); *In re Davey Roofing, Inc.*, 167 B.R. 604, 608 (Bankr. C.D. Cal. 1994) (noting that "the factual basis alleged by [the creditor] for piercing Debtor's corporate veil is that Debtor's principal diverted corporate assets for his personal use, thus injuring the corporation itself . . . ."); *Carr Am. Realty Corp. v. Nvidia Corp.*, 302 F. App'x 514, 516 (9th Cir. 2008) ("While the Creditors were harmed by the alleged diminution of [debtor's] estate, depleting the assets available for the bankruptcy estate constitutes an injury to the bankrupt corporation itself, not an individual creditor of that corporation.").

[39] *See Morris v. Rowallen Alaska, Inc.*, 121 P.3d 159, 162 (Alaska 2005) (explaining that the automatic stay provision of § 362(a)(1) generally applies only to the

(continued...)

property.[40]  In the instant case, International Steel was the debtor — Brown was not.[41]

---

[39]     (...continued)
debtor, not to third-party defendants or co-defendants, including "debtor's principals . . . partners, officers, directors, [or] shareholders" except in unusual circumstances not present here) (quoting 9B Am.Jur.2d *Bankruptcy* §1583 (1999)).

[40]     Neither the automatic stay provision of § 362(a)(1) nor the discharge injunction provision of § 354 prevent a creditor's personal alter-ego suit from proceeding outside of bankruptcy.

For cases allowing the action to proceed during the stay, see *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (holding that because creditor's claims were personal, creditor could pursue claims despite corporation's bankruptcy filing); *Harman v. Harper*, Nos. 86-2916, 87-1531, 1990 WL 121073, at *1 & n.1 (9th Cir. Aug. 21, 1990) (holding that district court's entry of judgment against alter egos did not violate automatic stay because judgment did not run against the debtor corporation); *Hamilton v. Am. Corrective Counseling Servs., Inc.*, No. 3:05-CV-434-RM, 2009 WL 973447, at *4 (N.D. Ind. Apr. 8, 2009) (holding that when the injury is directly against the creditor, "the injured creditor must sue the corporation's alter ego outside of bankruptcy") (citations omitted); *Konczyk v. Fillmyer*, Civ. A. Nos. 84–2912, 84–5039, 85–0911, 1986 WL 3078, at *2 (E.D. Pa. Mar. 5, 1986) ("The fact that plaintiffs' claim against a defendant who is in bankruptcy proceedings is stayed should not frustrate plaintiffs' [veil-piercing] claims against principals of the bankrupt."); *see also* 8A C.J.S. *Bankruptcy* § 477 ("Where estate property is not involved, the automatic stay generally does not protect persons other than the debtor or their property.") (footnotes omitted).

For cases allowing the action to proceed following the discharge injunction, see *E. Minerals & Chem. Co. v. Mahan*, 225 F.3d 330, 332-34 (3d Cir. 2000) (holding that creditor's alter-ego claim was not barred by the chapter 11 discharge of corporation's debts and remanding for creditor's alter-ego claim to proceed in the district court); *Plastipak Packaging, Inc. v. DePasquale*, 75 F. App'x 86, 87-88, 94 (3d Cir. 2003) (affirming the district court's decision to pierce the corporate veil after the corporation's debts were discharged in the corporation's chapter 11 bankruptcy case); *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994) (holding that where the claim belonged to the creditors personally, the creditors "can sue [the alter-egos] directly, outside of bankruptcy") (citations omitted); *Urbanco, Inc. v. Urban Sys. Streetscape, Inc.*, 111 B.R. 134, 135-37 (W.D. Mich. 1990) (refusing to reopen corporation's

(continued...)

Nothing in the bankruptcy court's confirmation order purported to discharge Brown's debts. Brown in effect asks us to extend the Bankruptcy Code's protections to a nondebtor — Brown himself.

Contrary to Brown's assertion that Knowles attempted to "undercut the general[] bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly," it is Brown who attempts to make an end run around the Bankruptcy Code by achieving its protections without ever filing for bankruptcy.[42]

---

[40]     (...continued)
bankruptcy case and allowing creditor's veil-piercing claim to proceed in state court); *Tactical Aerospace Corp. v. Reiner*, No. B172367, 2005 WL 479029, at *1-2 (Cal. App. Mar. 2, 2005) (corporation's debts were discharged in its chapter 11 bankruptcy case on May 14, 1999, and state court pierced corporate veil on January 18, 2001); *see also Reiner v. Rowen*, No. B148774, 2003 WL 1880150, at *1-3, 6 (Cal. App. Apr. 16, 2003) (affirming trial court's imposition of alter-ego liability after the corporation's debts were discharged in the corporation's chapter 11 bankruptcy case); *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. Dist. App. 1998) (holding that creditor could pierce corporate veil after the close of the corporation's bankruptcy case because the alter-ego claim belonged to the creditor personally, and the defendant's purchase of the estate's claims against him did not preclude the creditor from bringing its personal claim against him).

[41]     The bankruptcy court's confirmation order named "E. Brown, Inc. d/b/a International Steel" as the "Debtor."

[42]     And contrary to the dissent's suggestion that this decision would "deny relief . . . based on a merely formal objection to the notion of a corporation piercing its own veil," neither Brown nor International Steel ever sought any relief through piercing the corporate veil (nor would Brown ever have sought such "relief" by suing himself). It was the only wronged entity in this case, Leon Knowles, who sought the relief afforded by the procedural device of piercing the corporate veil. Moreover, today's opinion poses no bar to the notion of a corporation piercing its own veil. We do not reach the question because it is unnecessary to do so. *See supra* note 19.

Veil-piercing is an equitable doctrine, premised on the court's ability to look past the "legal fiction" to do equity.[43] In this regard, it must be remembered that Brown alone chose to put International Steel into bankruptcy. In *Brannon v. Continental Casualty Co.*,[44] we refused to extend the discharge injunction to a non-debtor insurance company that forced the insured into bankruptcy.[45] We explained:

> Holding that the bankruptcy court's discharge removed [the debtor's] ability to confess judgment on the [creditors'] claims would allow [the non-debtor insurance company] to benefit from forcing its insured into bankruptcy. Our reading of the bankruptcy court's orders avoids this inequitable result.[46]

Similarly, allowing Brown to benefit *because of* his misuse of the corporate form would be an inequitable result. Courts and commentators have noted the inequity in extending the discharge injunction to non-debtors.[47] Extending the discharge injunction to non-

---

[43] *Bangor Punta Operations, Inc. v. Bangor & A. R. Co.*, 417 U.S. 703, 713 (1974) ("[T]he corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy . . . .") (citation omitted); *Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 176 (Ky. 2012) (citation omitted).

[44] 137 P.3d 280, 288 (Alaska 2006).

[45] *Id.* at 288.

[46] *Id*.

[47] *See*, *e.g.*, Ralph Brubaker, *Bankruptcy Injunctions and Complex Litigation: A Critical Reappraisal of Non-Debtor Releases in Chapter 11 Reorganizations*, 1997 U. ILL. L. REV. 959, 995 n.126 (1997) ("It has been a cardinal principle of bankruptcy law from the beginning that its effects do not normally benefit those who have not themselves 'come into' the bankruptcy court with their liabilities *and* all their assets." (quoting *In re Venture Props., Inc.*, 37 B.R. 175, 177 (Bankr. D.N.H. 1984))) (emphasis added).

debtors gives the non-debtors "the benefit of a bankruptcy discharge without having to file a bankruptcy petition."[48]

## D. The Superior Court Did Not Err In Its Application Of Alaska's Veil-Piercing Doctrine.

Brown presents a variety of additional arguments against the superior court's use of Alaska's veil-piercing doctrine. First, Brown questions whether the "alter-ego" or "mere instrumentality" test for shareholder liability actually exists in Alaska. Second, if the test does exist, he argues that the superior court instructed the jury incorrectly on the nature of the test. Third, he argues that the superior court responded incorrectly to a question from the jury about the test. Fourth, he argues that the facts do not support piercing the corporate veil.

We reject Brown's arguments. In a recent decision addressing the doctrine of piercing the corporate veil, we summarized the central principles as follows:

> In general, courts seek to recognize and uphold "the principles that the corporation exists as a separate legal entity and that owner liability for the debts of the corporation is limited." . . . The corporate veil, however, may be pierced "if the corporate form is used to defeat public convenience, justify wrong, commit fraud, or defend crime" — a misconduct standard. In addition, in *Uchitel Co. v. Telephone Co.*, we also recognized that the corporate veil may be pierced when a corporation is nothing more than a "mere instrument" of a shareholder, and we laid out six primary factors to evaluate the rationality of imposing personal liability on the shareholder.[49]

---

[48] *Id*. at 995.

[49] *L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1125 (Alaska 2009) (citations omitted) (quoting *Pyramid Printing Co. v. Alaska State Comm'n for Human Rights*, 153 P.3d 994, 1000 (Alaska 2007); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)) (continued...)

It is therefore clear that the corporate form may be disregarded in Alaska under either of two alternate theories. The relation between the theories is disjunctive, not conjunctive.[50] Accordingly, there is no merit to Brown's argument that the " 'alter-ego' theory is murky, at best." Reviewing de novo the superior court's determinations of law, we affirm its conclusion that there are two alternate tests for piercing the corporate veil in Alaska, one dealing with mere instrumentality and the other with misconduct.

Also contrary to Brown's assertion, the superior court's jury instructions correctly defined the "mere instrumentality" test. The pertinent portion of the instructions is as follows:

> There are two ways in which a shareholder of a corporation may be liable for any damages assessed against the corporation: one, if the shareholder has used the corporate form to defeat public convenience, justify wrong, commit fraud or defend crime . . . or two, if the corporation is the mere instrumentality or alter ego of the shareholder.

The superior court then proceeded, correctly, to recite the *Uchitel* factors. We conclude that the superior court properly instructed the jury on the applicable law.

Next, Brown argues that the superior court offered an incorrect answer when the jury asked: "please define 'mere instrumentality or alter ego'; does this mean occasional or continuous activities?" The superior court responded:

---

**49** (...continued)
(citing *Uchitel Co. v. Tel. Co.*, 646 P.2d 229 (Alaska 1982)); *see also Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1063 n.12 (Alaska 2005) ("[A]buse of the corporate form ma justify piercing the corporate veil even in the absence of a showing of instrumentality.").

**50** *See L.D.G.*, 211 P.3d at 1126 n.46 (citing with approval Philip Reed Strauss, *Control and/or Misconduct: Clarifying the Test for Piercing the Corporate Veil in Alaska*, 9 ALASKA L. REV. 65 (1992)).

The conduct need not be continuous. It may be occasional conduct, but that conduct must be significant enough to meet the test described in Instruction No. 13A-B. The term "mere instrumentality or alter ego" is the conclusory label applied to the corporation if the test has been met.

In other words, the superior court referred the jury back to its original instructions. We affirm the superior court's instruction to the jury in response to the jury's question.

Finally, Brown argues that the facts do not support piercing the corporate veil. Brown made this argument to the superior court in his "Memorandum In Support Of Motion For Entry Of Judgment In Favor Of Edward Brown." We construe that motion as a motion for judgment notwithstanding the verdict, and we construe Brown's argument on appeal as a challenge to the denial of his motion. In *Roderer v. Dash*,[51] we explained that we will not consider a court's refusal to grant judgment notwithstanding the verdict if the party failed to move for directed verdict at the close of evidence.[52] Brown did not move for directed verdict at the close of evidence, and thus, we will not consider the court's refusal to grant judgment notwithstanding the verdict.

## E. The Superior Court Did Not Err In Awarding Knowles Overtime Compensation And Penalties Under AWHA.

After the jury determined that Brown owed Knowles an additional bonus of $62,311, the superior court accepted Knowles's argument that he was entitled to overtime compensation for the additional bonus, based on AWHA.[53] AWHA also grants penalties, including liquidated damages in an amount equal to the unpaid overtime

---

[51]     233 P.3d 1101 (Alaska 2010).

[52]     *Id.* at 1108.

[53]     AS 23.10.110(c), (e).

compensation,[54] and the superior court awarded those as well. Brown offers two arguments on appeal against the superior court's granting of Knowles's overtime and derivative AWHA claims. We address each argument in turn.

### 1. The superior court did not err in failing to dismiss Knowles's overtime and derivative AWHA claims as time-barred.

On September 25, 2002, Knowles received a bonus of $100,000. Knowles maintained that his bonus agreement with International Steel entitled him to a greater sum. The jury found that Brown did in fact owe Knowles an additional bonus of $62,311. Based on AWHA's requirement that overtime be paid on bonuses like Knowles's, the superior court awarded Knowles overtime on the increase in his bonus. Also pursuant to AWHA, the superior court awarded Knowles an equal amount in liquidated damages. Finally, AWHA grants Knowles additional penalties in the form of attorney's fees and costs,[55] and the superior court granted those to Knowles as well, at least in part.[56]

Brown argues that Knowles's overtime and derivative claims were barred by AWHA's two-year statute of limitations. The superior court addressed this issue in detail and correctly determined that Knowles's claims were not time-barred.

As an initial matter, neither party disputes that under AWHA, "[a]n employee is entitled to overtime compensation for hours worked in excess of eight hours

---

[54] *Id.*

[55] *Id.*

[56] In a later order specifying the precise amount of attorney's fees to be awarded, the superior court based its calculation in part on the statutory penalty in AS 23.10.110(e).

a day" and "for hours worked in excess of 40 hours a week."[57] Chapter 15 of the Alaska Administrative Code (AAC) makes clear that an employee receiving a bonus may be entitled to overtime compensation on that bonus,[58] and neither party disputes on appeal that the bonus agreement between Knowles and International Steel should have entitled Knowles to overtime compensation. But overtime claims under AWHA, and the liquidated damages that may derive from them, are subject to a two-year statute of limitations:

> An action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages under [AWHA] is forever barred unless it is started within two years after the cause of action accrues. For the purposes of this section an action is considered to be started on the date when the complaint is filed.[59]

The decisive issue is the date upon which Knowles's cause of action for unpaid overtime accrued. Because the term "accrue" is not defined in AWHA, and because AWHA calls for undefined terms to be construed in accordance with the federal Fair Labor Standards Act or regulations adopted under it,[60] the superior court inferred from an analysis of

---

[57]     AS 23.10.060(b).

[58]     8 AAC 15.100(a) (2011) ("An employee's regular rate is the basis for computing overtime. . . . An employee need not actually be hired at an hourly rate."); 8 AAC 15.100(b) (specifying the federal regulations to be used in calculating overtime "for an employee who receives a bonus"). We note that the latter regulation apparently contains a typographical error, directing the reader to the non-existent "28 C.F.R. 778.208 - 778.215" for guidance on calculating overtime on bonuses. 8 AAC 15.100(b)(5). The relevant regulations in fact appear at 29 C.F.R. §§ 778.208-215.

[59]     AS 23.10.130.

[60]     AS 23.10.145; *Quinn v. State Emps. Ass'n*, 944 P.2d 468, 470 n.3 (Alaska
(continued...)

federal law that the cause of action for a non-discretionary bonus like the one paid to Knowles "does not accrue until the bonus should be paid." We agree with the superior court's analysis of federal law.[61] The terms of Knowles's bonus agreement tied the amount of his bonus to accounting procedures that might be performed long after the completion of Knowles's work. Thus, his cause of action for unpaid overtime could not have accrued until the accounting procedures had been completed and the bonus had been calculated.

The parties disputed whether the accounting on the projects underlying Knowles's bonus claims had been completed by January 19, 2003, two years prior to the filing of the complaint on January 19, 2005. The superior court reviewed the evidence submitted by the parties, including a November 2004 document, referring to "wages and/or bonus payments which are outstanding and currently owed by International Steel to Knowles," and according to which "the parties will determine at a later time the total amount which Knowles is owed." The superior court found that Knowles's bonus had not been determined by November 2004, and thus, the cause of action had not accrued as of January 19, 2003. The overtime claim was therefore timely filed.

As the superior court observed, had Brown told Knowles that International Steel owed no bonus, or owed a specific amount in bonus, then "that assertion would have triggered the running of the statutory period." But Brown made no such assertion:

---

[60]    (...continued)
1997) (interpreting "accrues" in AWHA).

[61]    *See* ELLEN C. KEARNS, THE FAIR LABOR STANDARDS ACT 1211 (1999) ("The rule operates to make claims for additional compensation, such as contractual bonuses or commissions that are payable at a date later than the regular payday, accrue on the date those payments should have been made.") (citing 29 C.F.R. § 790.21 n.132.); *cf. Walling v. Harnischfeger Corp.*, 325 U.S. 427, 432-33 (1945).

> Brown and [International Steel] cannot be permitted to put off an accounting on one or more projects, all the while telling Knowles, for months, if not years, that the amount of the bonus was uncertain, and then, when Knowles files his complaint, take the position in litigation that the bonus should have been paid years ago or that the amount of the bonus was known or should have been known sooner and thus the complaint was untimely filed.

Because the superior court's factual findings were not clearly erroneous and its legal interpretations were not error, we affirm its decision regarding the timeliness of Knowles's claims.

###    2.    The court's calculation of the overtime and derivative AWHA claims did not amend the jury's findings.

Brown argues that the superior court's award was based on improper interference. Brown argues that this was error "because it essentially asked the superior court to make new factual findings and engage in additur as to disputed facts." Brown also suggests that the jury's $62,311 bonus calculation may already have included "some sort of overtime calculation." We conclude that the superior court did not modify the jury's findings, and that Brown waived any right to a jury trial on the issues determined by the superior court post-verdict.

First, Brown's claims that the superior court's post-verdict determinations were a form of "additur," or "disturbed" the jury verdict, or "amend[ed] the jury verdict," are without merit. Brown asserts that the jury may have incorporated Brown's overtime liability into its calculation of the bonus owed to Knowles, despite the absence of any reference to overtime liability in the jury's instructions, or in the wording on the special verdict form, which refers only to "additional bonus compensation." The superior court's post-verdict determinations in no way modified or disagreed with the factual determinations made by the jury.

Second, Brown's suggestion that the superior court's post-verdict determinations may have violated his right to a trial by jury under the Alaska Constitution is equally without merit. Article I, section 16 of the Alaska Constitution provides, "In civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of trial by a jury of twelve is preserved to the same extent as it existed at common law." But Rule 39(a) of the Alaska Rules of Civil Procedure clarifies that the right to a jury trial in general does not preclude a litigant from waiving the right to a jury trial on a specific issue:

> When trial by jury has been demanded and not waiver . . . the trial of all issues so demanded shall be by jury, unless (1) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court, consent to trial by the court sitting without a jury . . . .

At trial, Brown's attorney consented to the trial of certain issues by the court sitting without a jury. The concession arose during a discussion of what questions to include in the jury instructions, while the superior court considered aloud how to calculate overtime on Knowles's bonus if the jury determined that he was entitled to one:

> THE COURT: I mean, because otherwise we're going to — I mean, it seems to me that if they say it's — he's owed $70,000 worth of a bonus . . . .
>
> [BROWN'S ATTORNEY]: Be happy to let the parties and/or the Court decide that after.
>
> THE COURT: He's entitled to overtime on that. That's pretty clear to me, because bonuses get turned in — you know, you add them to your regular wage rate.
>
> [KNOWLES'S ATTORNEY]: I would — I believe that . . . .
>
> [BROWN'S ATTORNEY]: There's a potential argument with that, but I don't even know if we'll raise it. We're not talking about much money. . . . [W]e're talking 5- or $6,000. . . . I'd be happy to let the Court make that add-on. . . . Even if you . . . have to make a factual determination.

THE COURT: All I have to do, then, is say to them is he entitled to bonus, what's the amount.

[BROWN'S ATTORNEY]: Yes.

[KNOWLES'S ATTORNEY]: Yes.

THE COURT: . . . And if it turns out we can't agree on what happens, it'll be a judge question.

[BROWN'S ATTORNEY]: I would agree to that.

Brown's attorney not only explicitly invited the superior court to make the determination of how much overtime Knowles was owed on any unpaid bonus compensation found by the jury, he also explicitly agreed to submit to the jury, in relation to Knowles's bonus, only the two questions that were in fact submitted to the jury on that topic: Did International Steel owe Knowles additional bonus compensation? And, if so, how much? By limiting the jury's bonus questions to these two issues, Brown's attorney conceded that the superior court, and not the jury, would make any factual determinations not encompassed by these questions and necessary to determine Brown's liability as a result of the bonus, particularly in relation to overtime.

In addition, Brown's attorney agreed that if the parties could not agree "on what happens" as a consequence of the jury's bonus determination, the disputed issues should be resolved by the judge rather than a jury. As it happened, the parties could not agree on what happens under AWHA when an employer in International Steel's situation fails to pay part of the bonus of an employee in Knowles's situation. The superior court resolved the outstanding issues as "a judge question," precisely as the parties agreed. We thus affirm the superior court's calculation of Brown's overtime-related liabilities.

## F. The Superior Court Did Not Abuse Its Discretion In Its Attorney's Fees Award.

Brown offers several arguments for the reversal of the superior court's fee award. Specifically, Brown argues that: (1) Knowles was not, in fact, the prevailing party

in the case; (2) the superior court incorrectly awarded AWHA's penalty fees for legal work on Knowles's non-AWHA claims; and (3) Heidi should have received attorney's fees under Civil Rule 82.

### 1. The superior court did not abuse its discretion in determining that Knowles was the "prevailing party."

Despite his appeal, Brown argues that he, and not Knowles, was the prevailing party in the litigation below, or at least that the litigation was a "wash" in which neither party prevailed.

We note at the outset that while "prevailing party" is the standard under Rule 82 for awarding attorney's fees, the superior court made clear that the vast majority of the fees it awarded to Knowles derived from AWHA's penalty provision, AS 23.10.110(e).[62] The latter provision is triggered "[i]f the plaintiff prevails in an action for unpaid overtime compensation."[63]

Brown emphasizes on appeal the value of the claims on which Knowles did not prevail. But "[f]ailure to recover the full measure of relief sought or to prevail on all the issues raised does not necessarily preclude that party from 'prevailing party' status, provided that he is successful with regard to the 'main issue in the action.' "[64] In order to establish that the superior court did not abuse its discretion in identifying Knowles as the

---

[62] As the superior court noted, if Rule 82 "applied without any enhancements," Knowles would have received $19,565.42 in attorney's fees. Instead, the superior court awarded Knowles $102,392.40. The superior court factored in Rule 82 fees to its calculation as an analytically necessary but extremely minor and unquantified sum.

[63] AS 23.10.110(e).

[64] *Tobeluk v. Lind*, 589 P.2d 873, 876 (Alaska 1979) (quoting *Cooper v. Carlson*, 511 P.2d 1305, 1308 (Alaska 1973); *Buza v. Columbia Lumber Co.*, 395 P.2d 511, 514 (Alaska 1964)).

prevailing party, it is sufficient to note that Knowles emerged with a judgment that Brown had failed to pay him $62,311 in bonus compensation. It was reasonable to conclude that the bonus claim was the main issue in the action below, even if Knowles's unsuccessful claim to a wage raise could in theory have secured an even greater recovery.

### 2. The superior court did not abuse its discretion in awarding AWHA penalty fees to Knowles.

Against the superior court's calculation of attorney's fees for Knowles, Brown argues that the superior court abused its discretion by placing too much weight on Knowles's overtime claim under AWHA. Brown argues that Knowles's claim for his unpaid bonus was primarily a contract claim, and thus should have made Knowles eligible only for Rule 82 fees. In addition, Brown defeated Knowles's most significant AWHA claim, which asserted unpaid wages based on a claimed raise.

As the superior court noted, AWHA's fee award "is intended to provide a very significant disincentive to employers who might be pondering short changing an employee her wages or not settling a lawsuit making that claim." On its face, AWHA simply awards "reasonable" attorney's fees to prevailing plaintiffs,[65] without further specification of the term "reasonable," thus granting substantial discretion to trial courts. Brown failed to pay Knowles overtime compensation of $22,125.14. There is no evidence to suggest that Knowles could have obtained the overtime payment due to him by any avenue other than something resembling the very costly and protracted litigation that ultimately took place. As Knowles notes, "The effort required to secure a judgment against Brown was complex and expensive in terms of discovery and trial."

Under these circumstances, requiring Brown to pay 60% of Knowles's attorney's fees was not an abuse of discretion. Brown unlawfully withheld $22,125.14 in

---

[65]    AS 23.10.110(c), (e).

overtime compensation from Knowles over the course of several years, forcing Knowles to pursue a costly course of litigation in order to recover. It was not arbitrary, capricious, or manifestly unreasonable to conclude that at least 60% of Knowles's attorneys's work on the complexly interwoven claims in the case would have been necessary to prevail on Knowles's successful AWHA claims alone.[66]

### 3. The superior court did not abuse its discretion in refusing to grant Rule 82 attorney's fees to Heidi.

Brown argues that Heidi is entitled to Rule 82 attorney's fees as a prevailing party against Knowles, based on Knowles joining Heidi as a defendant in his Second Amended Complaint, deposing her, then dismissing her with prejudice at the commencement of the trial. At that time, Heidi then dismissed her counterclaims against Knowles. Knowles suggests that he tried to dismiss Heidi at the close of discovery, at the time he filed his Third Amended Complaint, but that she "declined to sign Knowles's proposed stipulations for dismissal, although she did not object to dismissal."

On February 12, 2009, the superior court declared itself as yet unwilling to determine whether Heidi or Knowles was the prevailing party as between themselves, and requested further briefing. After review of the subsequent briefing, the superior court found that neither Heidi nor Knowles was a prevailing party as between each other, and thus denied Heidi's motion for attorney's fees.

Heidi seeks attorney's fees under Civil Rule 82. Rule 82(b)(2) states: "In cases in which the prevailing party recovers no money judgment, the court . . . shall award the prevailing party in a case resolved without trial 20 percent of its actual attorney's fees

---

[66] *Bliss v. Bobich*, 971 P.2d 141 (Alaska 1998), cited by the superior court and addressed by both parties, provides precedent for the validity of discretionary splits in attorney's fees where both Rule 82 and AWHA claims are at issue. But because of the materially different procedural background in *Bliss*, which we will not reprise here, *Bliss* provides little further guidance under the facts of the present case.

which were necessarily incurred." As the superior court recognized, the dispositive issue is who, if anyone, between Heidi and Knowles, was the prevailing party.

Though the superior court's April 27, 2009 order denying Heidi's motion was apparently accompanied by no memorandum laying out the order's rationale,[67] the superior court was within its discretion to maintain its initial impression that neither Heidi nor Knowles "was a prevailing party since neither really pursued the claim or claims against the other."

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's decision in all respects.

---

[67] In *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 305 (Alaska 2000), we observed that "[i]f the trial court deviates from [the] formula" in Civil Rule 82(b), according to which a trial court is obligated to award the prevailing party in a suit resolved before trial twenty percent of its actual attorney's fees, then the court "must provide a written explanation for doing so." In the present case, however, the superior court determined there was no prevailing party between Knowles and Heidi, and no further explanation was required.

FABE, Justice, dissenting.

## I.     INTRODUCTION

Because I am convinced that allowing Knowles's claims to proceed outside of bankruptcy would subvert the purposes of the Bankruptcy Code by dissipating the property of the debtor and giving priority to Knowles's claim over the claims of other creditors, I respectfully dissent. In my view, Knowles's veil-piercing claim against Brown was property of the bankruptcy estate. The estate therefore had exclusive standing to bring that claim in bankruptcy court. Knowles's lack of standing was made permanent after the bankruptcy court confirmed the reorganization plan. I therefore conclude that Knowles did not have standing to assert his claim in state court, and his case should have been dismissed. Moreover, the court's decision to allow Knowles to bring his veil-piercing claim against Brown in state court, outside of bankruptcy, threatens to deprive small business owners of the protections of the bankruptcy code, particularly in light of our weak test for piercing the corporate veil. The court's reaffirmance of the disjunctive test for piercing the corporate veil will result in "Mom and Pop" business owners being personally liable for a bankrupt corporation's debts even when there is no evidence of fraud, misconduct, or abuse of the corporate form. The court's decision could result in a rush to the state courthouse any time a small business declares bankruptcy.

## II. DISCUSSION

### A. A Bankruptcy Trustee[1] Has Standing To Bring Claims Belonging To The Debtor Corporation.

A Chapter 11 bankruptcy trustee is the representative of the bankrupt estate and has the capacity to sue and be sued.[2] The trustee is charged with collecting and reducing to money the property of the estate.[3] Once a bankruptcy proceeding has begun, § 362(a)(3) of the Bankruptcy Code[4] operates as an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[5] With the exception of exclusions not relevant to this case, the property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[6] This language is construed broadly and includes the debtor's causes of action,[7] which should be brought by the trustee in bankruptcy court.[8]

---

[1] The current case involves a debtor-in-possession, not a bankruptcy trustee. But "[t]he authority granted to a debtor-in-possession supervising a Chapter 11 case is virtually identical to that granted to a trustee; what differences there are do not affect this case. Thus, our discussion of a trustee's powers is applicable to the role of a debtor-in-possession." *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1342 n.3 (7th Cir. 1987) (citing 11 U.S.C. § 1107) (discussing a bankruptcy trustee's standing to bring a veil-piercing claim in bankruptcy court).

[2] 11 U.S.C. § 323 (2006).

[3] 11 U.S.C. § 704(a)(1) (2006).

[4] 11 U.S.C. §§ 101-1330 (2006) ("the Bankruptcy Code").

[5] 11 U.S.C. § 362(a)(3) (2006).

[6] 11 U.S.C. § 541(a)(1) (2006).

[7] *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983) (quoting H.R. REP. NO. 95-595, at 367 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323) ("The
(continued...)

But "[t]he trustee may assert only claims belonging to the debtor corporation and has no standing generally to sue third parties on behalf of the estate's creditors."[9] Thus the trustee "stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy."[10]

## B. If The Trustee Has Standing To Bring A Claim, That Standing Is Exclusive.

"When the trustee does have standing to assert a debtor's claim, that standing is exclusive and divests all creditors of the power to bring the claim."[11] The trustee retains exclusive standing to bring a claim unless the trustee abandons the claim with leave of the bankruptcy court, or the bankruptcy court allows a third party to pursue a claim on behalf

---

[7]     (...continued) scope of this paragraph [§ 541(a)(1)] is broad. It includes all kinds of property, including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act."); *see also In re Transcolor Corp.*, 296 B.R. 343, 359 (Bankr. D. Md. 2003) (noting that § 541(a) "casts a wide net"); *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987) (noting that § 541 "offers an expansive definition of property comprising the estate").

[8]     *In re Transcolor Corp.*, 296 B.R. at 353-54.

[9]     *Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1250 (9th Cir. 2010) (quoting *Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005)) (internal quotation marks omitted).

[10]     *Id.* (quoting *Smith*, 421 F.3d at 1002) (internal quotation marks omitted).

[11]     *Id.*; *see also Estate of Spirtos v. One San Bernardino Cnty. Superior Court Case Numbered SPR 02211*, 443 F.3d 1172, 1176 (9th Cir. 2006) ("We therefore reaffirm our previous reasoning and that of our sister circuits and hold that the bankruptcy code endows the bankruptcy trustee with the exclusive right to sue on behalf of the estate.").

of the trustee.[12]  If the estate in this case did have standing to bring an alter ego claim against Brown, then it was error not to dismiss Knowles's state-court veil-piercing action.

## C.    State Law Determines Whether A Claim Belongs To The Trustee Or To A Creditor.

The United States Supreme Court held in *Butner v. United States* that the scope of property rights held by a bankruptcy trustee, like the scope of all property rights, is a question of state law:

> Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.  Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.[13]

---

[12]     *See Koch*, 831 F.2d at 1346-47 (citing *In re Consolidated Bancshares, Inc.*, 785 F.2d 1249, 1253-54 (5th Cir. 1986) and *Mitchell Excavators by Mitchell v. Mitchell*, 734 F.2d 129, 132 (2d Cir. 1984)) ("The trustee may abandon an action to a third party, and that party may then pursue it.  However, if the claim is not abandoned by the trustee and a third party attempts to prosecute, such law suits have usually been dismissed."); *Dallas Cabana, Inc. v. Hyatt Corp.*, 441 F.2d 865, 868 (5th Cir. 1971) ("The fact that the trustee has failed to prosecute a claim does not permit a would-be plaintiff to bring suit without first petitioning the bankruptcy court for an order authorizing abandonment of the property."); *see also* Mark L. Prager & Jonathan A. Backman, *Pursuing Alter-Ego Liability Against Non-Bankrupt Third Parties: Structuring A Comprehensive Conceptual Framework*, 35 ST. LOUIS U. L.J. 657, 677 (1991) ("In the years since the enactment of the Bankruptcy Code, virtually all courts have held that creditors may not pursue against third parties claims that vest in the estate.").

[13]     440 U.S. 48, 54-55 (1979), *superseded by statute*, United States Bankruptcy Code, Pub. L. 95-598, 92 Stat. 2549 (1978).  Although the Bankruptcy Code superseded *Butner*, the Supreme Court has subsequently reiterated this holding.  *See Barnhill v. Johnson*, 503 U.S. 393, 397-98 (1992).

Because a cause of action is a type of property within the meaning of the Bankruptcy Code,[14] whether a veil-piercing claim against Brown belongs to the estate in this case is a matter of Alaska law. Federal circuit courts have consistently acknowledged that whether a bankruptcy trustee has exclusive standing to bring a veil-piercing claim against an alleged alter ego is a matter of state law.[15] In *Ahcom, Ltd. v. Smeding* for example, the Ninth Circuit Court of Appeals, citing *Butner*, concluded that "state law determines whether a claim belongs to the trustee or to the creditor."[16] We should therefore apply Alaska law to determine whether the estate had standing — and thus exclusive standing — to bring a veil-piercing claim against International Steel.

---

[14]   *See* note 7 above.

[15]   *See, e.g.*, *In re Moore*, 608 F.3d 253, 259-60 (5th Cir. 2010) (examining whether a veil-piercing cause of action belonged to the bankruptcy estate under Texas law); *In re Icarus Holding, LLC*, 391 F.3d 1315, 1318 (11th Cir. 2004) ("Because standing to assert the alter ego claim is a question of state law in this case, we must review the district court's decision in accordance with Georgia law."); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989) ("We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside of the bankruptcy proceedings depends on an analysis of state law."); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135-36 (4th Cir. 1988) ("The courts that have confronted the issue whether an alter ego claim can be brought by the trustee have accordingly looked to the nature of that claim under state law. . . . [W]e conclude that *under Virginia law* an alter ego claim is property of the estate under § 541(a).") (emphasis in original); *Koch*, 831 F.2d at 1344 ("State law determines whether property is an asset of the debtor."). *But see Steinberg v. Buczynski*, 40 F.3d 890 (7th Cir. 1994) (deciding, without citation to a single state law case, that the bankruptcy trustee did not have standing to bring an alter ego claim).

[16]   623 F.3d 1248, 1250 (9th Cir. 2010) (citing *Butner*, 440 U.S. at 54-55) (examining California law).

The court today apparently agrees that "which legal claims are property of the estate [is] a matter of state law."[17] Nevertheless, the court repeatedly and almost exclusively cites federal cases to support the contention that a claim cannot belong to the trustee unless it alleges direct harm to the corporation.[18] The court devotes only a single conclusory sentence to Alaska standing doctrine.[19] To the extent that the court is suggesting that federal law is relevant to whether a trustee has standing to bring a claim in Alaska, that view is clearly incorrect and conflicts with the holdings of the Supreme Court in *Butner*[20] and the Ninth Circuit in *Ahcom*.[21] In my view, International Steel had standing under Alaska law to pursue Brown's personal assets in satisfaction of its corporate debts.

D. **The Estate Had Standing To Bring A Veil-Piercing Claim Against International Steel In Bankruptcy Court.**

"Standing is a rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions."[22] The plaintiff must have a "sufficient personal stake" in the outcome of the controversy, but this is not a high

---

[17]    Slip Op. at 17.

[18]    Slip Op. at 12-16.

[19]    Slip Op. at 13.

[20]    *Butner*, 440 U.S. at 54-55.

[21]    *Ahcom, Ltd.*, 623 F.3d at 1250.

[22]    *Law Project for Psychiatric Rights, Inc. v. State*, 239 P.3d 1252, 1255 (Alaska 2010) (quoting *Keller v. French*, 205 P.3d 299, 302 (Alaska 2009)) (internal quotation marks omitted).

bar: "[A]n identifiable trifle is sufficient to establish standing to fight out a question of principle."[23]

In a single sentence discussing Alaska standing doctrine, the court concludes that International Steel did not have standing to bring a veil-piercing claim in bankruptcy court because "[i]n Alaska if a plaintiff fails to assert a legal injury entitling the plaintiff to relief, the plaintiff has no legal claim and the suit must be dismissed."[24] But we have never before decided whether an alter ego's control of a corporation constitutes a legal injury entitling the corporation to relief.

To support its statement, the court cites three Alaska cases: *Neese v. Lithia Chrysler Jeep of Anchorage, Inc.*[25] (discussing a citizen's standing to bring a class action lawsuit against an automobile dealership for failing to disclose information about its vehicles); *Keller v. French*[26] (discussing standing of senators to challenge a legislative investigation); and *Brause v. State, Department of Health & Social Services*[27] (discussing a same-sex couple's standing to challenge the denial of certain benefits). But these cases simply require that a party have sufficient interest in the case to satisfy the standing requirement. They are clearly distinguishable from the present case and do not answer the question whether a debtor-in-possession has an interest in bringing a veil-piercing claim against itself to recover the assets of an alleged alter ego.

---

[23]     *Keller*, 205 P.3d at 304-05 (internal quotation marks and citations omitted).

[24]     Slip Op. at 13.

[25]     210 P.3d 1213, 1219 (Alaska 2009).

[26]     205 P.3d at 305.

[27]     21 P.3d 357, 359 (Alaska 2001).

Instead of relying on Alaska law, the court cites federal cases for support, many of which interpret California law.[28] But although precedent from other jurisdictions can sometimes be useful when deciding issues of first impression, it is inconclusive in this case. Many federal circuit courts have held that the bankruptcy trustee has standing to bring a veil-piercing claim if the "claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor."[29] If the claim could only be asserted by a particular creditor, then the claim is not general.[30] In this case, Knowles's alter ego claim was a general one that could have been brought by any creditor. These courts would conclude that the debtor-in-possession had exclusive standing to bring a veil-piercing claim in bankruptcy court. Other courts have held that a trustee has standing to bring a veil-piercing claim only if the trustee claims that the

---

[28]     Slip Op. at 12-16.

[29]     *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700-01 (2d Cir. 1989)); *see also In re Moore*, 608 F.3d 253, 258-59 (5th Cir. 2010) (reaffirming *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142 (5th Cir. 1987)); *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008); *In re Icarus Holding, LLC*, 391 F.3d 1315, 1321 (11th Cir. 2004); *In re Schimmelpenninck*, 183 F.3d 347, 359-60 (5th Cir. 1999); *Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987); *Matter of S.I. Acquisition, Inc.*, 817 F.2d at 1153-54.

[30]     *See Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (holding that, under California law, a veil-piercing claim against the corporation to hold an alleged alter ego liable for the corporation's contractual debts was a claim particular to the creditor because "California law does not recognize an alter ego claim or cause of action that will allow a corporation and its shareholders to be treated as alter egos for purposes of all the corporation's debts").

alleged alter ego has harmed the corporation directly — for example, by looting corporate assets.[31] There does not appear to be a clear majority position.

I would look instead to the equities of the case. Piercing the corporate veil is an equitable exercise, and therefore whether a particular party has an interest in making such a claim is an equitable question.[32] My analysis is informed by the purposes of the Bankruptcy Code.[33] The equities of this case convince me that the debtor-in-possession had an interest in piercing its own veil to hold Brown accountable for the debts of International Steel.

In this case, Knowles attempted to circumvent the protections of the Bankruptcy Code by trying to achieve in state court what he had been denied in bankruptcy court. Particularly troubling is the prospect that each of International Steel's creditors could bring a similar state-court veil-piercing claim against Brown. The facts that Knowles alleged to justify piercing the corporate veil were not particular to him or his injury. Knowles alleged generally that Brown had taken "actions in disregard of the corporate entity" and that "International Steel was a mere instrumentality or alter ego of Edward Brown." But those same facts could be alleged to hold Brown personally liable

---

[31]    *See Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1002 (9th Cir. 2005); *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir. 1994); *Matter of Educators Group Health Trust*, 25 F.3d 1281, 1285 n.4 (5th Cir. 1994).

[32]    *See Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 713 (1974).

[33]    *See In re Schimmelpenninck*, 183 F.3d at 359 ("[W]hen considering whether a creditor's cause of action 'belongs to' the debtor or seeks 'recovery or control' of property of the debtor, the [Bankruptcy] Code's general policies of securing and preserving the debtor's property and ensuring equal distribution of that property to similarly situated creditors should remain a paramount concern.").

to every other creditor of International Steel.[34] I conclude that if Knowles's "action based upon alter ego may proceed completely outside of bankruptcy, then any creditor . . . may do likewise."[35]

I agree with those courts that have found that allowing such claims to be brought outside of bankruptcy court would subvert the purposes of the Bankruptcy Code.[36] Knowles would be allowed to collect his claim from a pool of assets that should be available to all of International Steel's creditors.[37] And satisfaction of this claim would be "undiluted by the pro-rata distribution between all creditors that would otherwise occur in bankruptcy court."[38] The result would be a multi-jurisdictional rush to judgment that would make the orderly distribution of assets envisioned in the Bankruptcy Code

---

[34] *See L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1125 (Alaska 2009) (quoting *Uchitel Co. v. Telephone Co.*, 646 P.2d 229, 235 (Alaska 1982)) (recognizing that "the corporate veil may be pierced when a corporation is nothing more than a 'mere instrument' of a shareholder"). The disjunctive test for piercing the corporate veil has been criticized as too permissive. *See, e.g.*, STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL § 2.2, at 124-25 n.10 (2012).

[35] *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1154 (5th Cir. 1987); *see also Koch Refinery v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987) ("[T]he alter ego theory is an equitable, remedial doctrine that may be asserted by any creditor without regard to the specific nature of his relationship with the corporation and its alleged alter ego.").

[36] *See In re Schimmelpenninck*, 183 F.3d at 359-60; *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700-01 (2d Cir. 1989); *Koch*, 831 F.2d at 1346; *Matter of S.I. Acquisition*, 817 F.2d at 1153-54.

[37] *See Kalb, Voorhis & Co.*, 8 F.3d at 133.

[38] *Matter of S.I. Acquisition, Inc.*, 817 F.2d at 1153.

impossible.[39]  Such a ruling would also promote conflicting judgments such that "one creditor may convince a court or jury that [a corporation and its alleged alter ego] are all one in the same, while another creditor may not.  Problems of collateral estoppel and unfair distribution of debtor assets would clearly abound."[40]  I therefore conclude that granting the bankruptcy trustee exclusive standing to assert alter ego claims is necessary in this context to ensure that all similarly situated creditors are treated fairly.[41]

The court's decision to allow veil-piercing claims to be brought by individual creditors outside of bankruptcy also threatens to deprive small business owners of the protections of the bankruptcy code.  Today the court reaffirms its allegiance to a permissive disjunctive test for piercing the corporate veil.  Under this test, the shareholders of a corporation may be held personally liable for the corporation's debts without a showing of fraud or misconduct merely for exerting improper control over the corporation.  Exposing the owners of small "Mom and Pop" businesses to personal liability outside of bankruptcy will allow creditors to reach their personal assets to satisfy corporate debts without affording the business owners the protections of bankruptcy proceedings.

---

[39]     *See id.* at 1154.

[40]     *Id.*

[41]     *See Kalb, Voorhis & Co.*, 8 F.3d at 133; *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 700-01 (quoting H.R. REP. NO. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6297) ("When considering the automatic stay provision, the House Report stated that the stay 'provides creditor protection.  Without it, certain creditors would be able to pursue their own remedies against the debtor's property.  Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.'  It is plain from this passage that Congress intended to protect all creditors by making the trustee the proper person to assert claims against the debtor.  This reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion.").

I note that we have never before held that a corporation may pierce its own veil under Alaska law. In *Roberts v. State, Department of Revenue*, we held that self-piercing was impermissible where a corporation's majority shareholder attempted to disavow the corporate form for his own benefit.[42] Our decision did not imply, however, that self-piercing is impermissible in all circumstances.[43] It is now necessary to consider whether self-piercing is permissible in this circumstance.

We have stated that we are strongly disposed against disregarding the corporate form and will only allow the corporate veil to be pierced in exceptional circumstances.[44] But veil-piercing is an equitable doctrine under which "the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy."[45] I would not deny relief under the doctrine in this case based on a merely formal objection to the notion of a corporation piercing its own veil. In my view, corporations should not be prohibited from piercing their own veils in bankruptcy court where equity so demands.[46]

---

[42]    162 P.3d 1214, 1220-21 (Alaska 2007).

[43]    *See id.*

[44]    *See L.D.G., Inc. v. Brown*, 211 P.3d 1110, 1125 (Alaska 2009) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)).

[45]    *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703, 713 (1974).

[46]    This view is consistent with the Georgia Supreme Court and numerous federal courts that have interpreted state law to allow self-piercing in the context of bankruptcy. *See, e.g.*, *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 300-01 (Ga. 2005) (permitting self-piercing actions under Georgia law); *Rochester Gas & Elec. Corp. v. GPU, Inc.*, 355 F. App'x 547, 550-51 (2d Cir. 2009) (applying New York law); *In re Schimmelpenninck*, 183 F.3d 347, 355-56 (5th Cir. 1999) (applying Texas law); *Phar-*

(continued...)

I conclude that the debtor-in-possession had exclusive standing to bring a veil-piercing claim against Brown. In my view, Knowles's veil-piercing action against Brown became property of International Steel's estate when International Steel filed its bankruptcy petition on January 20, 2005. Knowles's action in the superior court should have been stayed on that date under § 362 of the Bankruptcy Code.

**E.** **Knowles Did Not Regain Standing To Pursue A Veil-Piercing Claim In State Court After The Bankruptcy Case Was Dismissed.**

Having concluded that the estate had exclusive standing to bring a veil-piercing claim, it is necessary to examine whether the bankruptcy court's dismissal of the case revested standing in International Steel's creditors. I conclude that dismissal of the case had no effect on the debtor-in-possession's exclusive standing to bring claims belonging to the debtor.

Citing 11 U.S.C. § 349(b)(3), which, upon dismissal of a bankruptcy case, revests the property of the estate in the entity who owned it immediately prior to the commencement of the case, Knowles contends that upon dismissal of the case, "the

---

**46**     (...continued)

*Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994) (applying New Jersey law); *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 131-34 (2d Cir. 1993) (applying Texas law); *St. Paul Fire & Marine Ins. v. PepsiCo, Inc.*, 884 F.2d 688, 700-01 (2d Cir. 1989) (applying Ohio law); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988) (applying Virginia law); *In re Landmark Fence Co., Inc.*, 424 B.R. 461, 463-64 (Bankr. C.D. Cal. 2010); *In re OODC, LLC*, 321 B.R. 128, 136-37 (Bankr. D. Del. 2005); *In re Lee Way Holding Co.*, 105 B.R. 404, 411-12 (Bankr. S.D. Ohio 1989). *Cf. Greater Hammond Cmty. Servs., Inc. v. Mutka*, 735 N.E.2d 780, 785 (Ind. 2000) (quoting *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind. 1995)) ("While we have expressed willingness to use our equitable power to disregard the corporate form to prevent fraud or unfairness to *third parties*, we perceive little likelihood that equity will ever require us to pierce the corporate veil to protect the same party that erected it.") (italics in original) (quotation marks omitted).

Corporation and its creditors returned to their prepetition status."[47] Thus, Knowles argues, the veil-piercing claim was no longer property of the estate and he was free to assert it against Brown in state court.

But courts have generally concluded that § 349 applies only where a bankruptcy case is dismissed before approval of the reorganization plan.[48] Here, the Plan was confirmed before the case was dismissed. International Steel's veil-piercing claim against Brown vested in International Steel upon confirmation of the Reorganization Plan under 11 U.S.C. § 1141(b), which states that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."[49] The confirmation order made no attempt to restrict the effect of the

---

[47] "Unless the court, for cause, orders otherwise, a dismissal of a [bankruptcy] case . . . revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title." 11 U.S.C. § 349(b)(3) (2006).

[48] *Matter of Depew*, 115 B.R. 965, 972 (Bankr. N.D. Ind. 1989); *see also In re Page*,118 B.R. 456, 459-60 (Bankr. N.D. Tex. 1990) (" 'In a case under Chapter 11, the estate continues until confirmation of the plan under § 1129, at which time all of the property of the estate vests in the debtor. After that time, the estate is no longer in existence.' Therefore, [§ 349(b)] . . . has no impact in this case." (citations omitted) (quoting *In re Frank Meador Buick, Inc.*, 59 B.R. 787, 791 (Bankr. W.D. Va. 1986))); *United States v. Standard State Bank*, 91 B.R. 874, 879 (W.D. Mo. 1988) (holding that only property left in the estate at the time of dismissal revested in the original entity); *In re Searles*, 70 B.R. 266, 270 (D. R.I. 1987) ("The few cases that mention subsection 349(b)(3) refer to its applicability only in the context of property or property rights that have not passed out of the bankruptcy estate.").

[49] 11 U.S.C. § 1141(b) (2006); *see also Matter of Depew*, 115 B.R. at 972 (citing 11 U.S.C. § 1141(b), (c)); *In re Grinstead*, 75 B.R. 2, 3 (Bankr. D. Minn. 1985) ("Once a plan of reorganization is confirmed, the bankruptcy estate ceases to exist unless the plan specifically provides otherwise, and all estate property revests in the debtor subject to the terms and conditions imposed by the plan.") (citing 11 U.S.C. § 1141(b)).

confirmation as far as property of the estate was concerned. Indeed, it contained a provision "vest[ing] all of the property of the estate in the reorganized Debtor." Accordingly, International Steel's Chapter 11 estate ceased to exist and the veil-piercing claim, along with any remaining property of International Steel's estate, was transferred out of the estate and vested in International Steel.[50] Section 349 had no effect in this case because there was no more property in the estate to return to creditors.[51] I therefore conclude that Knowles did not have standing to assert his veil-piercing claim in state court.

**F. The Court's Decision To Allow Knowles To Proceed Outside Of Bankruptcy Is Particularly Troubling Given Its Decision To Reaffirm The Disjunctive Test For Piercing The Corporate Veil.**

In my view, the court's decision today undermines the policies of the Bankruptcy Code protecting similarly situated creditors by allowing creditors to circumvent the bankruptcy process by bringing veil-piercing claims in state court. But this decision is made even more troubling by the court's reaffirmation of a permissive disjunctive test for piercing the corporate veil in Alaska.[52]

The adoption of the disjunctive test makes Alaska a significant outlier from the overwhelming majority rule.[53] And when the court draws a line with *Uchitel* on one

---

[50] *See Matter of Depew*, 115 B.R. at 972 (citing *In re Balogun*, 56 B.R. 117, 118 (Bankr. M.D. Ala. 1985)) ("By virtue of § 1141(b), any remaining property of the estate was transferred out of the estate and vested in the debtor.").

[51] *See In re Page*, 118 B.R. at 459-60.

[52] Slip Op. at 23.

[53] *See* 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 41.30 (perm. ed., rev. vol. 2006) (citing to 38 different states for the proposition that "[t]here are . . . two general elements required by most jurisdictions[:] First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; second, the

(continued...)

side and misconduct on the other, it de-emphasizes the role of misconduct in the *Uchitel* analysis. Consequently, small businesses and closely held corporations, which by nature are generally going to qualify for some of the *Uchitel* factors regardless whether they are abusing the corporate form, face a great risk that they can lose the benefit of the corporate form and the protection of bankruptcy.[54]

Further, under the disjunctive standard it seems that abuse of the corporate form alone, without any indicia that the shareholder to be targeted had any control over the corporation, would be sufficient to pierce the corporate veil and hold that shareholder liable. If this were true, then a small shareholder of a large corporation could theoretically be liable for corporate misconduct that the shareholder had no part in and likely did not even know about. I therefore believe Alaska should join its sister states by adopting a conjunctive test for piercing the corporate veil that would require a showing of both control and misconduct.

---

[53]    (...continued) circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.").

[54]    *See* Stephen B. Presser, *The Bogalusa Explosion, "Single Business Enterprise," "Alter Ego," and Other Errors: Academics, Economics, Democracy, and Shareholder Limited Liability: Back Towards a Unitary "Abuse" Theory of Piercing the Corporate Veil*, 100 Nw. U. L. Rev. 405, 408-09 (2006) (explaining that the reasons for the adoption of limited liability were two-fold: (1) to encourage investment in capital-scarce early markets and (2) "to promote republican government" by encouraging economic investment by smaller investors, thus ensuring that not "only the very wealthy could afford to invest in corporations" causing them to become undemocratic plutocracies, and also allowing smaller investors "investment in the community sufficient to enable them to exercise independent judgment in the choice of leaders and public policy").

## III. CONCLUSION

Because I believe Knowles lacked standing to assert his claim in state court, I respectfully dissent.